JOHN G. SARGENT, ATTORNEY GENERAL *v.* RUTLAND RAILROAD COMPANY.

October Term, 1912.

Present: ROWELL, C. J., MUNSON, WATSON, and HASELTON, JJ.

Opinion filed January 9, 1913.

*Constitutionality of Statutes—Effect of Partial Invalidity— State Demurrage Law—Conflict with Interstate Commerce.*

The constitutionality of a statute is to be tested, not by what has been done under it, but by what it authorizes to be done.

The fact that a part of a statute is unconstitutional does not make the whole statute void, unless all its provisions are so connected and interdependent that it cannot be presumed that the Legislature would have enacted the valid part without the other.

Where a statute is expressed in plain and unambiguous language there is no room for construction, and there the rule that a statute must be construed so as to make it constitutional, if that is reasonably possible, does not apply.

P. S. 4539, 4541, providing that no railroad company doing business in this State shall charge any demurrage on freight received at any station in this State until four days, not including Sundays or holidays, after notification to the consignee of its arrival, with a penalty for its violation, and No. 147, Acts 1910, making the same regulation as to cars placed for a shipper to load, apply to demurrage charges, regardless of whether the freight belongs to interstate or intrastate commerce, and so are repugnant to the commerce clause of the Federal Constitution, and to Interstate Commerce Act Feb. 4, 1887, as amended, and enforced by the Interstate Commerce Commission by demurrage rules allowing only two days free time for loading and unloading interstate freight shipments; and those provisions are inseparable from the statutes as a whole and render them wholly void.

APPEAL from an order of the Public Service Commission commanding the appellant to desist from exacting demurrage charges on intrastate shipments after only two days free time, in violation of P. S. 4539, and No. 147, Act. 1910.

The allegations of fact in the petition, also in the answer, are admitted to be true, and these facts are made a part of the report of the Public Service Commission. It appears that the petitionee is a public service corporation of the states of Vermont and New York, for the transportation of passengers and freight for hire therewithin; that it operates a railroad extending from Ogdensburg, New York, to Chatham, New York, via Alburgh, Burlington, Rutland, and Bennington, all in the state

of Vermont, also a railroad within the latter state, extending from Rutland to Bellows Falls, and from Leicester Junction, same state, to Fort Ticonderoga in the state of New York, and from Alburgh, Vermont, to Noyan Junction, Canada; that it connects with other railroads at nearly all these places, and at other places named in the petition, located in the state of New York and in Canada, and at all said points interchanges freight cars with such other railroads; that substantially all the freight cars in the United States and in Canada have for a long time been and now are interchanged, operated, and used under an agreement entered into by all the railroad companies operating therein, the agreement being commonly known as the "American Railway Association Car Service Rules"; that these rules (some parts of which are set forth at length in the answer) provide, among other things, that when a railroad company's cars are loaded upon its own line, destined to points beyond its line, they shall be carried through to the destination of the freight; that foreign cars, i. e., cars on roads to which they do not belong, must be promptly returned to their owners, and to this end such cars may be loaded for interstate or intrastate shipments in the direction of the owner, with certain preferences and upon conditions not material here to mention.    The rules also provide that foreign cars shall be paid for at the rate of thirty cents (30c) per car per day for the months of March, April, May, June and July of each year and thirty-five cents (35c) per day for the remaining seven months.    The operation of all cars on the petitionee railroad is in accordance with these rules, and the petitionee is in this State both an intrastate and an interstate carrier of freight and passengers for hire.

December 18, 1909, the Interstate Commerce Commission issued the following:
"Circular Letter No. 2, Series 1909.
Interstate Commerce Commission.
Proposed Uniform Demurrage Code.
The National Association of Railway Commissioners has adopted the uniform demurrage code reported by its Committee on Car Service and Demurrage, and recommends that it be made generally applicable on both state

and interstate traffic. The Interstate Commerce Commission, recognizing the great benefits to be derived from uniformity in car-service rules, is desirous of lending its influence to the movement. The Commission therefore indorses the rules adopted by the national association, and recommends that they be made effective on interstate transportation throughout the country. This action is, of course, subject to the right and duty of the Commission to inquire into the legality or reasonableness of any rule or rules which may be made the subject of complaint.

Edward A. Moseley, Secretary.

Washington, D. C., December 18, 1909.

Demurrage Rules.

Rule 1.    Cars Subject to Rules.

Cars held for or by consignors or consignees for loading, unloading, forwarding directions, or for any other purpose, are subject to these demurrage rules, except as follows: * * *

Rule 2.    Free Time Allowed.

(a) Forty-eight hours (two days) free time will be allowed for loading or unloading on all commodities.

(b) Twenty-four hours (one day) free time will be allowed: (This subdivision b is not material to the questions involved in this case).

Rule 7.    Demurrage Charge.

After the expiration of the free time allowed, a charge of $1 per car per day, or fraction of a day, will be made until car is released.

August 30, 1910, Rutland Railroad Company issued, published and filed with the Interstate Commerce Commission as provided by law for issuing, publishing and filing tariffs, a tariff designated I. C. C. A-28 to become effective October 1, 1910, containing the Car Demurrage Rules set forth in said Commission's order of December 18, 1909, applicable to all cars moving on its road.

September 27, 1910, the Interstate Commerce Commission issued an order suspending said tariff, as follows:

"At a General Session of the Interstate Commerce Commission, held at its office in Washington, D. C., on the 27th day of September A. D. 1910.

Docket No. 3400, Sub. 8.

In the matter of the investigation and suspension of certain demurrage schedules.

It appearing from the records of the Interstate Commerce Commission that there has been filed with the Commission by the within named carriers schedules designated as follows:

(Here the schedules of eight railroad companies, including that of "I. C. C. A-28" of the petitionee, are named).

which schedules state new individual or joint rates, fares or charges, or new individual or joint classifications, or new individual or joint regulations or practices affecting such rates, fares or charges.

It is ordered, That the Commission, upon its own initiative and upon complaint, without formal pleading and without answer by the interested carriers, do enter upon a hearing concerning the propriety of such rates, fares, charges, classifications, regulations or practices stated in said schedules, with a view to making such order in the premises as may after full hearing, seem just and proper, and that such hearing be held at such time (not later than October 18, 1910), and place as may be hereafter fixed by the Commission.

The Commission being further of the opinion, that pending such hearing and decision of the Commission concerning the propriety of such rates, fares, charges, classifications, regulations or practices, the operation of such schedules should be postponed for the reason that from a consideration of the character and amount of such rates, fares, charges, classifications, regulations or practices, and the circumstances under which they have been made, it appears to the Commission there is sufficient ground for claiming that the rates, fares, charges, classifications, regulations or practices, established by said schedules are unjust and unreasonable, and therefore unlawful, and that the public interest requires that the operation of said schedules

be deferred until sufficient time has been given for an investigation by this Commission.

It is further ordered, That the operation of the aforesaid schedules be suspended, and that the use of the rates, fares or charges therein specified be deferred until November 1, 1910.

It is further ordered, That the several carriers above named that have filed schedules, be and they are hereby made defendants to this proceeding, and that a copy of this order be forthwith served upon each of them.

A true copy:

Edw. A. Moseley, Secretary.''

October 22, 1910, the Interstate Commerce Commission issued another order further suspending the operation of said schedules until the 1st day of December, 1910, pending its hearing and decision in the premises.

It was finally determined by that commission that the demurrage rules indorsed by it in its order of December 18, 1909, and contained in the petitionee's tariff of August 30, 1910, would be reasonable as applied to New England territory, and thereupon the petitionee on July 31, 1911, issued, published, and filed as provided by law for issuing, publishing, and filing tariffs, a tariff putting said rules into effect September 1, 1911, which rules have hitherto remained in effect and the petitionee is collecting and intends to continue to collect demurrage in accordance therewith. These same rules have been adopted by, and are in effect upon, all railroads in the United States.

On the facts admitted by the petition and answer, the Public Service Commission held that the prayer of the petition should be granted, and by its order and decree the petitionee was strictly forbidden and enjoined from charging, collecting, or receiving any demurrage charge on any car placed by the petitionee within this State for the unloading of freight shipped from a place within this State, over a route wholly therein, or for cars placed within this State for the loading of freight therein for shipment over routes wholly within this State, until four days, not including Sundays or holidays, after the petitionee shall have notified, verbally or by mail, the consignor that such car is held, or has been placed, to his use.

From this report, order, and decree, the petitionee appealed.

By Art. 1, sec. 8, of the Constitution of the United States, "The Congress shall have power * * * to regulate commerce with foreign nations, and among the several states, and with the Indian Tribes"; and "To make all laws which shall be necessary and proper for carrying" this power into execution. By the Interstate Commerce Act of 1887, as amended June 18, 1901, April 13, 1903, and June 29, 1906, the provisions of that statute shall apply "to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad * * *, from one state or territory of the United States or the District of Columbia, to any other state or territory of the United States or the District of Columbia, * * *, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, * * *: Provided, however, that the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property wholly within one state and not shipped to or from a foreign country from or to any state or territory as aforesaid, * * *; the term 'transportation' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported; and it shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation upon reasonable request therefor, and to establish through routes and just and reasonable rates applicable thereto, and to provide reasonable facilities for operating such through routes and to make reasonable rules and regulations with respect to the exchange, interchange, and return of cars used therein, and for the operation of such through routes, and providing for reasonable compensation to those entitled thereto."

By section 6, every common carrier subject to the provisions of this act is required to file with the Interstate Commerce Commission and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on

its own route and points on the route of any other carrier by rail-road, etc.; and such schedules shall also state all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Every such common carrier shall also file with said commission copies of all contracts, agreements, or arrangements with other common carriers in relation to any traffic affected by the provisions of this act to which it may be a party. No carrier shall charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any services in connection therewith, than the rates, fares, and charges specified in the tariff filed and in effect at the time.

By section 12, the said commission shall have authority to inquire into the management of the business of all such common carriers, shall keep itself informed as to the manner and method in which the same is conducted, and is authorized and required to execute and enforce the provisions of the act.

*Edwin W. Lawrence* for the appellant.

Intrastate movements of cars owned by foreign companies are brought under Federal control by the Interstate Commerce Act and state laws regulating detention of such cars are void. *St. L. & S. W. Ry. v. Arkansas,* 217 U. S. 136; *Southern Ry. Co. v. Reid,* 222 U. S. 424; *Southern Ry. Co. v. Reid and Beam,* 222 U. S. 444; *Northern Pacific Ry. v. Washington,* 222 U. S. 370.

The statutes in question, even if construed to apply to intrastate shipments are a substantial burden upon and discriminate against interstate commerce. *Shepherd* v. *Northern Pacific Ry. Co.,* 184 Fed. 765, 772; *Mondou* v. *N. Y., N. H. & H. R. R. Co.,* 223 U. S. 1; *Southern Ry. Co.* v. *United States,* 222 U. S. 20; *Western Union Telegraph Company* v. *Kansas,* 216 U. S. 1; *Interstate Commerce Commission* v. *Goodrich Transit Co.,* 224 U. S. 194.

*John G. Sargent,* Attorney General, for the appellee.

WATSON, J. By the Laws of 1906, No. 122, sec. 8 (P. S. 4539), "No railroad or transportation company doing business in this State shall charge, collect, or receive any demurrage charge on freight received at any station in this State until four days, not including Sundays or holidays, after it shall have notified, verbally or by mail, the consignee of such freight of its arrival." By section 10 a penalty is provided for each violation of these provisions. And by the Laws of 1910, No. 147, sec. 1, "No railroad or transportation company doing business in this State shall charge, collect, or receive any demurrage charge upon any car placed or held for loading in this State until four days, not including Sundays or holidays, after it shall have notified verbally or by mail, the consignor that such car is held or has been placed to his use according to the order previously received."

The defence is, that these statutes are void, as repugnant to the commerce clause of the Constitution of the United States, because (1) they apply to interstate as well as intrastate commerce; and (2) if they apply to intrastate commerce only, such application works a substantial burden upon and discriminates against interstate commerce.

The Public Service Commission construed the law of these sections as pertaining only to commerce wholly within the State, and its order in the premises was limited accordingly. This construction, the petitioner says is as it should be, for otherwise the law might be subject to constitutional objections, and a statute is never to be construed so as to be unconstitutional if a reasonable construction can be placed upon it, which will give its provisions constitutional effect.

As to the soundness of the last stated principle of construction the parties are at one. But the appropriateness of its application to the provisions under consideration is questioned, it being said that the statute in terms applies to interstate, as well as to intrastate, commerce, and that the two elements are inseparable, and since the valid portion cannot be separated from the invalid, that principle of construction does not apply.

The petitionee, as a common carrier, is operating a railroad or railroads in character intrastate, interstate, and international. Its business in this State, as regards commerce, partakes of each of the same elements of character. At various places in the states of New York and Vermont, and in Canada, its road con-

nects with other railroads, and at such places of connection there is an interchange of freight cars with such other railroads, under the "American Railway Association Car Service Rules," common to all the railroad companies operating in this country, and under which substantially all the freight cars in the United States and in Canada are made interchangeable. Under these car service rules, a home car, loaded with freight to points beyond that line, shall be carried through to the destination of the freight, a practice essential to the economic efficiency of such public service companies, and alike beneficial to the carriers and to the public. By the same rules foreign cars must be promptly returned to their owners; but in so doing they may be loaded to the road from which originally received, if such loading is in the direction of the home road; loaded in local service in the direction of any junction point with the home road; loaded locally in an opposite direction from the home road or home route, if to be loaded according to certain rules toward the home road, or so it will participate in the freight rate.

The effect of these provisions seems to be such, among other things, that when a foreign car comes into this State loaded with freight of a nature to be taken from the car by the consignee, destined in part for each of two points in the state, domestic freight of like nature between such places, going in the same direction, may be carried at the same time in the same car; and in returning the car to the home road, it may be engaged at the same time in carrying freight of the same nature in part destined for some point within this State and in part for some point beyond the State. Thus such cars may concurrently be instruments of state and of interstate commerce, and this seems likely to be of such frequent occurrence in the practical operations under the car service rules, as to render it proper of notice in determining the questions before us; for the constitutionality of a law is to be tested, not by what has been done under it, but by what may rightfully, by its authority, be done. *Montana Company.* v. *St. Louis Mining and Milling Co.,* 152 U. S. 160, 38 L. ed. 398, 14 Sup. Ct. 506.

Under the Act of 1906, whence the freight was shipped, and under the Act of 1910, the destination of the freight to be loaded into the car placed or held at a consignor's request, does not by any reasonable construction enter into the essential elements

22

of the thing prohibited. The plain general terms of the enactments purport to apply to demurrage charges on all freight received by consignees direct from cars at any station in this State, and upon all cars placed or held, at the request of consignors, for loading in this State, without regard to the class of commerce to which the former belongs, or in connection with which the latter are being used. The two sections are clothed in language, plain and most apt to cover the whole field. The part which is unconstitutional, if there be any such, is inseparable from that which is not.

It is true, as argued, that the fact that a part of a statute is in violation of the Constitution, does not authorize courts to declare the whole statute void, unless all the provisions are connected in subject-matter, depending on each other, operating together for the same purpose or otherwise so connected together in meaning, that they are not severable, or it cannot be presumed the Legislature would have passed the valid part without the other. If the invalid portion can be eliminated and that which remains be complete in itself and capable of being executed in accordance with the apparent intent of the Legislature, wholly independent of the eliminated portion, it must be sustained. *State* v. *Scampini,* 77 Vt. 92, 59 Atl. 201; *State* v. *Abraham,* 78 Vt. 53, 61 Atl. 766; *State* v. *Paige,* 78 Vt. 286, 62 Atl. 1017, 6 Ann. Cas. 725; *Howard* v. *Illinois Central R. Co.,* 207 U. S. 463, 52 L. ed. 297, 28 Sup. Ct. 141. But when, as here, the provisions of the statute are clothed in plain language, and unambiguous, there is no room for construction. The effect is not to be determined on the basis of striking out or disregarding some of the words in the statute, nor by inserting others not there. It is not within the judicial province to give the words used a broader or a narrower meaning than they were manifestly intended to have, in order to bring the scope of the statute within the constitutional power of the Legislature to enact. *United States* v. *Reese,* 92 U. S. 214, 23 L. ed. 563; *United States* v. *Harris,* 106 U. S. 629, 27 L. ed. 290, 1 Sup. Ct. 601; *Trade Mark Cases,* 100 U. S. 82, 25 L. ed. 550; *Baldwin* v. *Franks,* 120 U. S. 678, 30 L. ed. 766, 7 Sup. Ct. 656; *James* v. *Bowman,* 190 U. S. 127, 47 L. ed. 979, 23 Sup. Ct. 678.

In *United States* v. *Ju Toy,* 198 U. S. 253, 49 L. ed. 1040, 25 Sup. Ct. 644, questions were before the court based upon the

Chinese Exclusion Acts. After stating that the act purports to make the decision of the department final, whatever the ground on which the right to enter this country is claimed,—as well when it is citizenship as when it is domicile, and the belonging to a class excepted from the exclusion acts; that the relevant portion of the Act of August, 1894, was not void as a whole, and that the statute had been upheld and enforced, the court, through Mr. Justice Holmes, said: "But the relevant portion being a single section, accomplishing all its results by the same general words, must be valid as to all it embraces, or altogether void. An exception of a class constitutionally exempted cannot be read into those general words merely for the purpose of saving what remains. That has been decided over and over again."

In *Howard* v. *Illinois Central R. Co.*, 207 U. S. 463, 52 L. ed. 297, 28 Sup. Ct. 141, the question of the validity of the Federal Employers' Liability Act was involved. By section 1, "Every common carrier engaged in trade or commerce in the District of Columbia, or in any territory of the United States, or between the several states, * * *, shall be liable to any of its employees, * * *,—for all damages which may result from the negligence of any of its officers, agents, or employees, * * *." The questions raised concerned the nature and extent of the power of Congress to regulate commerce, it being contended, among other things, that the repugnancy of the act of the Constitution clearly appeared, as the face of the act made it certain that the power asserted extended not only to the regulation of master and servant among themselves as to things which were wholly interstate commerce, but embraced those relations as to matters and things domestic in character, and not coming within the authority of Congress. The court, Mr. Justice White, now the Chief Justice, delivering the opinion, said that from the first section it was certain that the act extended to every individual or corporation engaged in interstate commerce as a common carrier; that its all-embracing words left no room for any other conclusion; that the statute was addressed to the individuals or corporations engaged in interstate commerce, but was not confined solely to regulating the interstate commerce business which might be done by such persons or corporations; that the liability of a common carrier was declared to be in favor of "any of its employees"; that as the word "any" was unqualified, it

followed that the liability to the servant was coextensive with the business done by the employers embraced by the statute, the court instancing a railroad engaged in interstate commerce, having a purely local branch operated wholly within a state. It was held that as the act included subjects wholly beyond the power to regulate commerce, and depended for its sanction upon that authority, it was unconstitutional and could not be enforced unless there was merit in the propositions advanced to show that the statute might be saved. None of the propositions to which allusion is made was sustained, but we are here interested more particularly in the one, that the statute might be interpreted so as to confine its operation wholly to interstate commerce, or to means appropriate to the regulation of that subject. Thereon the court said the argument that because the statute says carriers engaged in commerce between the states, etc., therefore the act should be interpreted as being exclusively applicable to the interstate commerce business, and none other, of such carriers, and the words "any employee," as found in the statute, should be held to mean any employee when engaged only in interstate commerce, required the court to read into the statute words of limitation and restriction not found in it. To quote from the opinion, "The principles of construction invoked are undoubted, but are inapplicable. Of course, if it can be lawfully done, our duty is to construe the statute so as to render it constitutional. But this does not imply, if the text of an act is unambiguous, that it may be rewritten to accomplish that purpose. Equally clear is it, generally speaking, that where a statute contains provisions which are constitutional and others which are not, effect may be given to the legal provisions by separating them from the illegal. But this applies only to a case where the provisions are separable, and not dependent one upon the other, and does not support the contention that that which is indivisible may be divided. Moreover, even in a case where legal provisions may be severed from those which are illegal, in order to save, the rule applies only where it is plain that Congress would have enacted the legislation with the unconstitutional provisions eliminated. All these principles are so clearly settled as not to be open to controversy." It was further held that since the act, by its terms, related to every common carrier engaged in interstate commerce, and to any of the employees of

every such carrier, the court was unable to say that the statute would have been enacted had its provisions been restricted to the limited relations of that character which it was within the power of Congress to regulate. Although the questions involved in this, and in the preceding case noticed, were based upon Federal statutes in terms overreaching congressional power, and not upon state enactments extending beyond state control, as in the case at bar, the governing principles of construction are the same. Other cases illustrative of this point are, *Louisville & Nashville R. Co.* v. *Central Stock Yards Co.,* 212 U. S. 132, 53 L. ed. 441, 29 Sup. Ct. 246; and *Illinois Central R. Co.* v. *McKendree,* 203 U. S. 514, 51 L. ed. 298, 27 Sup. Ct. 153.

There is much force in the contention that the statutory provisions in question, by the free time fixed therein which shall be allowed for loading and unloading cars in this State, directly burden interstate commerce, and are therefore an encroachment upon the exclusive power of Congress, on the principle that nothing can be done by a state which will operate as a burden on the interstate business of a common carrier engaged therein, or impair the usefulness of its facilities or instruments of interstate traffic. (See *Stone* v. *Farmers Loan and Trust Co.,* 116 U. S. 307, 29 L. ed. 636, 6 Sup. Ct. 334, 388, 1191; *Covington and Cincinnati Bridge Co.* v. *Kentucky,* 154 U. S. 204, 38 L. ed. 962, 14 Sup. Ct. 1087; *McNeill* v. *Southern Ry. Co.,* 202 U. S. 543, 50 L. ed. 1142, 26 Sup. Ct. 722; *Interstate Commerce Com.* v. *Illinois C. R. Co.,* 215 U. S. 452, 54 L. ed. 280, 30 Sup. Ct. 155); but we do not decide this question, for conceding the subject-matter of the statute to be one within the power of the state to regulate for the comfort and convenience of its citizens, in the absence of congressional action, even though it may indirectly affect interstate commerce (See *Missouri Pacific R. Co.* v. *Larabee Flour Mills Co.,* 211 U. S. 612, 53 L. ed. 352, 29 Sup. Ct. 214; *Hardwick Farmers Elevator Co.* v. *Chicago, Rock Island and Pac. Ry. Co.,* 110 Minn. 25, 124 N. W. 819, 19 Ann. Cas. 1088; *Bagg* v. *Wilmington, etc. R. Co.,* 109 N. C. 279, 14 S. E. 79, 14 L. R. A. 596, 26 Am. St. Rep. 569), yet by the Interstate Commerce Act, executed and enforced through the Interstate Commerce Commission, there had been congressional regulation of the same subject-matter, so far as it pertained to commerce among the states, and the rules thus prescribed are materially different

from the provisions of the state enactments. By the former, the free time allowed is forty-eight hours (two days), while under the latter it is four days. In such circumstances the two statutes cannot both be operative; and the power of the state being subordinate to that of the nation, it must yield. In *Gulf, Colorado & Santa Fe Ry. Co.* v. *Hefley & Lewis*, 158 U. S. 98, 39 L. ed. 910, 15 Sup. Ct. 802, a statute of Texas, providing that it should be unlawful for any railroad company in that state, to charge and collect, or to endeavor to charge and collect, from the owner, agent, or consignee of any freight, goods, wares and merchandise a greater sum for transporting said freight, goods, wares and merchandise than was specified in the bill of lading, was held to be in conflict with the Interstate Commerce Act, and therefore the state statute must give way, for said the court, speaking through Mr. Justice Brewer, "Generally it may be said in respect to laws of this character that, though resting upon the police power of the state, they must yield whenever Congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter, for that power, like all other reserved powers of the states, is subordinate to those in terms conferred by the Constitution upon the nation." To the same effect are *Hemington* v. *State of Georgia*, 163 U. S. 299, 41 L. ed. 166, 16 Sup. Ct. 1086; *Southern Ry. Co.* v. *King*, 217 U. S. 524, 54 L. ed. 868, 30 Sup. Ct. 594; *Southern Ry. Co.* v. *Reid*, 222 U. S. 424, 56 L. ed. 257, 32 Sup. Ct. 140.

*The injunction is dissolved, the order and decree are vacated and set aside, and the petition is dismissed.*