## MICHIGAN CENTRAL RAILROAD CO. *v.* MICHIGAN RAILROAD COMMISSION.

1. CONSTITUTIONAL LAW — INTERSTATE COMMERCE — RAILROADS — CARRIERS—FREIGHT.

    In the exercise of the exclusive power vested in the Federal congress to regulate commerce with foreign nations and among the several States, that body has completely and thoroughly considered and legislated upon the subject of interstate commerce, so as to obtain the exclusive authority to pass legislation with reference thereto.

2. SAME—DEMURRAGE.

    Terminal and storage charges and the rules and regulations relating thereto, as mentioned in sections one and six of the Federal statute of June 29, 1906, 34 U. S. Stat. 584, include demurrage.[1]

3. SAME—INTERSTATE COMMERCE.

    Shipments for interstate commerce become impressed with the character of such commerce from first receipt until final delivery to the consignee.

4. SAME—POWERS OF THE STATES.

    In consequence of the action of congress in legislating upon the subject of terminal charges and of the rules of the Interstate Commerce Commission promulgated in 1909 and 1912, relating to demurrage, and tentatively indorsing and adopting the regulations and rates of the American Railway Association, the authority of the States to enact laws concerning such matters as are included by the Federal act has ceased, and Federal jurisdiction is exclusive.

5. SAME.

    Having adopted, whether tentatively or permanently, the revised rules of the American Railway Association affecting demurrage and other terminal charges, the Interstate Commerce Commission has assumed to act under the Federal statute and the subject has been removed from

---

[1] On the power of the State as to demurrage charges by carrier on interstate shipments, see note in 30 L. R. A. (N. S.) 137.

the jurisdiction of the States, so that Act No. 173, Pub. Acts 1911, in so far as it purports to regulate demurrage rates and charges, invades the exclusive power of congress and is unconstitutional.

6. SAME—INTRASTATE COMMERCE—DEFINITION—UNIFORM RULES.

Any car service on a car which has moved or is about to move in intrastate commerce is intrastate and is within State authority, and in so far as the rules adopted by the Michigan Railroad Commission, regulating demurrage charges, affect traffic of this nature, they are valid, and are not unreasonable because they differ in some particulars from the uniform rules indorsed by the Interstate Commerce Commission.

7. SAME—BURDEN OF PROOF—EQUITY—MICHIGAN RAILROAD COMMISSION.

*Held,* also, that the regulations of the defendant as to intrastate traffic do not burden interstate commerce so as to invalidate them and that complainant railroad companies had failed to meet the burden of proof resting on them by statute to establish the unlawfulness or unreasonableness of the orders.

Appeal from Wayne; Hally, J.   Submitted June 15, 1914.   (Docket No. 11.)   Decided October 3, 1914.

Bill by the Michigan Central Railroad Company and others against the Michigan Railroad Commission to enjoin the enforcement of certain demurrage rules adopted by defendant.   From a decree for complainants, defendant appeals.   Modified and affirmed.

*Beaumont, Smith & Harris* (Grant Fellows, Attorney General, of counsel), for appellant.

*Taylor, Delbridge & Behr,* for appellees.

STONE, J.   This cause deals with the power of the defendant to promulgate rules covering car service and demurrage, applicable to shipments of freight loaded or unloaded, in Michigan, and the validity of the rules promulgated by the defendant on July 5,

1912. The history of the controversy is somewhat lengthy and involved.

As early as January 1, 1909, the railroads of the lower peninsula of the State promulgated and placed in effect a set of demurrage rules applicable to both State and interstate business in Michigan. Those rules were contained in tariffs regularly filed by the railroads, with both the defendant and the Interstate Commerce Commission.

During the year 1909 the National Association of Railroad Commissioners, composed of the railroad commissioners of the several States, and the Interstate Commerce Commission, gave consideration to the formulation of a code of car service and demurrage rules. This code was finally adopted by that association, and was tentatively approved by the Interstate Commerce Commission, on December 18, 1909. The Michigan railroads decided to adopt these rules, and announced them to be effective May 1, 1910, and published their tariffs and filed them as required by law. In the meantime the defendant had under consideration, on a complaint pending before it, the formulation of a set of demurrage rules, and on February 3, 1910, it promulgated, by an order, such a set of rules to be effective March 1, 1910, accompanied by an opinion as to its power, and as to the reasonableness of its rules.

Upon March 1, 1910, a bill of complaint was filed in the circuit court for the county of Wayne, in chancery, by a number of railroad companies, which are likewise parties complainant in the instant case, praying that the defendant be restrained from enforcing the rules it had promulgated to be effective on that date. The bill charged in substance that the defendant, under the act by which it was created, had no authority to make such rules; that the rules themselves were a burden upon interstate commerce; and that, by the express terms of the act, the defendant com-

mission was limited in its power over transportation to the transportation of property between points within the State of Michigan. The defendant demurred to this bill of complaint. Upon a hearing in the circuit court a decree was entered sustaining the demurrer. Upon an appeal to this court by complainants, the decree of the lower court was reversed, and it was held in substance that the statute (Act No. 300, Pub. Acts 1909) limited the authority of the defendant to the regulation of transportation within the State of Michigan. *Ann Arbor R. Co.* v. *Railroad Commission,* 163 Mich. 49 (127 N. W. 746). Justice BLAIR, writing the opinion, said:

"It is apparent, therefore, that, by the terms of the act creating the defendant and defining its powers, its authority to promulgate demurrage rules is limited to cases where the property has been or is to be transported 'between points within this State.' It becomes unnecessary, therefore, to consider the power of the legislature to grant the authority claimed for the defendant or the other interesting questions discussed in the briefs of counsel, since the limitations of the act creating it negative any authority on the part of defendant to establish and enforce demurrage rules where the transportation is interstate."

This opinion was handed down September 28, 1910. As the law then stood, it is therefore *res adjudicata* that the defendant had no jurisdiction over demurrage upon interstate shipments.

However, by Act No. 173, Public Acts of 1911 (3 How. Stat. [2d Ed.] §§ 6526, 6531), sections 3 and 8 of the act under which the defendant was organized were amended, so that they read as follows; the amendments appearing in italics:

"SEC. 3 (*d*). The provisions of this act shall apply to the transportation of passengers and property between points within this State, and to the receiving, switching, delivering, storing and handling of such

property, and to all charges connected therewith, including icing and mileage charges: *Provided, however, that this provision shall not be construed as a limitation on the authority of the commission created by this act to prescribe car service and demurrage rules applicable to all traffic beginning or ending within this State."*

"SEC. 8. Every railroad shall, when within its power so to do, and upon reasonable notice, furnish suitable cars to any and all persons who may apply therefor, for the transportation of any and all kinds of freight in car load lots.   *   *   *   The commission shall have power to make and enforce, and shall make and enforce reasonable regulations for the furnishing and distribution of freight cars to shippers and switching the same, and for the loading and unloading thereof, and for the weighing of the cars and the freight offered for shipment over any line of railroad and shall fix a reasonable *per diem* demurrage to be paid for the detention of cars by shipper or consignee *(which said car service and demurrage rules and regulations shall be applicable to all traffic whether the same begin or end within the State of Michigan)*, and for the failure or delay of the railroad in the furnishing of such cars, and for the failure of the railroad to move the cars the number of miles per day as ordered by the commission."

At the time of the above legislation, the present case was pending in the circuit court, but the bill of complaint was so framed as to raise only the question of the power of the defendant to enforce its demurrage rules as to intrastate commerce.

An order had been entered on handing down our decision in the *Ann Arbor Railroad Company Case*, modifying the previous injunction, and permitting the railroad companies to make effective, on interstate business, the rules known as the uniform rules, and permitting the defendant to enforce upon State business the rules it had promulgated.

In view of the State legislation above referred to, the complainants, on September 2, 1911, filed an

amended bill of complaint, setting forth the foregoing proceedings, and charging that the defendant claimed that it had the power to enforce its rules upon both State and interstate business in Michigan; that the freight cars of complainants could not be detained without unlawfully burdening interstate commerce; that defendant had no authority to promulgate its rules as to interstate commerce; that the power of the defendant was limited to State traffic; that no other power had ever been conferred on it by the State legislature; that the legislature had no authority to confer any power upon the defendant to affect demurrage; that the said act of the legislature of 1911, purporting to extend the power of the defendant, in that respect, was beyond the power of the legislature; that interstate commerce began with the loading of the property intended for interstate shipment, and continued until it was unloaded; that the Interstate Commerce Commission had complete jurisdiction over interstate commerce; that the rules promulgated by the defendant would constitute a burden upon interstate commerce; that the rules so promulgated gave an advantage to shippers in intrastate commerce; that the allowance of extra time would afford such an advantage, would increase the expense to the railroads, cause trouble and annoyance in the handling of cars, greatly increase the expense of the carriers under the interchange agreement, and delay the use of cars; and that, in such respects as the Michigan rules differ from the uniform rules, they would constitute a burden upon interstate commerce. The defendant answered the amended bill, admitting that it claimed authority to promulgate rules, but denying that the rules it had promulgated would materially extend the time within which cars would be detained. It admitted the amendment of the statute of 1911, and declared that the legislature had power

to confer the authority therein attempted to be conferred on the defendant; that under this amendment the defendant had authority to promulgate rules applicable to both State and interstate commerce, and denied that its rules were a burden upon interstate commerce, or would cause any inequality or discrimination.

On October 5, 1911, the defendant reissued its order directing that its demurrage rules should become effectual on both State and interstate business, and on January 31, 1912, the complainants again amended their bill of complaint, calling attention to the making of this order, and praying for an injunction, and on February 7, 1912, an injunction was issued restraining the defendant from making effectual its said order of October 5, 1912.

Under an order of reference theretofore entered, the parties proceeded to take proofs, and, these having been completed, the court entered an order, on June 22, 1912, referring to the defendant the testimony and proofs, in accordance with the provisions of the act of 1909. On July 5, 1912, the defendant entered an order which recited the proceedings that had been taken before it, and the fact that the proofs had been certified to it, and had been examined; that the demurrage rules established by the railroad companies in Michigan were unreasonable and unjustly discriminatory, and the defendant promulgated a new set of rules, which appear in the record and are known as the rules of July 5, 1912. Later, and on August 21, 1912, on application of complainants, the court issued an injunction against the defendant, forbidding it to enforce its new rules of July 5th. While this litigation had been progressing, the so-called uniform rules, or national car demurrage rules, had been the subject of frequent discussion by the National Association of Railroad Commissioners, by the American Railroad

Association, and by the Interstate Commerce Commission. The American Railroad Association had issued certain explanations of these rules and had adopted the rules themselves and had modified them from time to time. Finally, on June 3, 1912, the Interstate Commerce Commission issued its bulletin to the effect that it had tentatively indorsed such revised rules. That bulletin reads as follows:

"INTERSTATE COMMERCE COMMISSION.
"WASHINGTON, D. C., June 3, 1912.
"REVISED NATIONAL CAR DEMURRAGE RULES.
"The American Railway Association on May 15, 1912, adopted a revised set of national car demurrage rules, that being the designation used by the American Railway Association for the uniform demurrage code tentatively approved by the commission on December 18, 1909, and also a revised set of the explanations to the national car demurrage rules tentatively approved on April 11, 1911.

"The Interstate Commerce Commission, recognizing the great benefits to be derived from uniformity in car service rules, is desirous of lending its influence to the movement. The commission therefore tentatively indorses the revised rules and explanations thereto adopted by the American Railway Association and recommends that they be made effective on interstate transportation throughout the country. This action is of course subject to the right and duty of the commission to inquire into the legality and reasonableness of any rule or rules which may be made the subject of complaint.

"By the Commission:
[Seal.]    "JOHN H. MARBLE, Secretary."

The above-mentioned rules and their explanation, and the defendant's revised rules promulgated July 5, 1912, are published in the record in parallel columns. The testimony having been returned to the court, by the defendant with its revised rules, the case came on for hearing, and the learned circuit judge found that the bill of complaint was well founded, and

that its prayer should be granted. A decree was entered reciting that it appeared to the court "that the State of Michigan and the defendant are without any power, jurisdiction, or authority to promulgate, establish, or enforce demurrage rules as to the transportation of property in commerce with foreign nations and among the several States, and the movement and use of cars, vehicles, and other instrumentalities therefor, referred to in said bill of complaint as interstate commerce, or to establish demurrage rules applicable to all traffic beginning or ending within the State of Michigan, and it further satisfactorily appearing that it is impossible to have two sets of demurrage rules in existence within the State of Michigan, one affecting interstate traffic as aforesaid, and the other affecting transportation for hire of property in commerce wholly between points within the State of Michigan, referred to in said bill of complaint as intrastate commerce, and materially differing from each other, without the latter becoming a material burden upon and regulation of interstate commerce, and it satisfactorily appearing to the court that the rules promulgated and proposed to be enforced by said defendant, as set forth in said amended bill of complaint, would, if enforced, constitute a material burden upon and regulation of interstate commerce," etc., the defendant was perpetually restrained from promulgating, enforcing, or attempting to establish or enforce its said demurrage rules. The defendant has appealed.

By reference to the two sets of rules, the uniform rules, as finally revised, and the Michigan Railroad Commission rules, as revised on July 5, 1912, it may be said that they differ only as follows: Three days for unloading coal allowed by the Michigan rules, as compared with two days allowed by the uniform rules. Three days allowed for unloading lumber (except

cargo and lightered lumber) allowed by the Michigan rules, as against two days allowed by the uniform rules. Three days for the loading or unloading of interior finish allowed by the Michigan rules, as against two days allowed by the uniform rules. Three days for loading cars with furniture loaded by several consignors allowed by the Michigan rules, as against two days by the uniform rules. Five days' free time allowed by the Michigan rules for unloading cargo and lightered lumber as against two days allowed by the uniform rules. Five days allowed by the Michigan rules for loading, weighing, and billing coal at the mines, as against two days allowed by the uniform rules. Five days' free time allowed by the Michigan rules for unloading coal to be used for fueling transient vessels, as against two days allowed by the uniform rules. One day to fit up cars with lining for the loading of potatoes allowed by the Michigan rules, as against no allowance for this service by the uniform rules. The allowance for bunching and weather interference, to shippers operating under the average time agreement, as provided in the Michigan rules, as against the elimination of such an allowance as provided by the uniform rules.

These, as we understand it, are the particular provisions, as to which complainants contend that the Michigan rules are more liberal to the shipper than the uniform rules. In other words, they insist that the shippers would receive more time, and would that much longer detain cars, if they were operating under the Michigan rules, than if they were operating under the uniform rules. As we understand complainants' position it is that:

(1) The defendant has no power or authority to enforce demurrage rules as to shipments in interstate commerce.

(2) The defendant has no power or authority to

promulgate and enforce demurrage rules applicable to intrastate commerce only, which materially differ from the uniform code, or which are unreasonable in themselves, for the reason that such rules constitute a regulation of, and burden upon, interstate commerce.

Answering the foregoing propositions, we understand the claim of defendant to be:

(1) Demurrage and car service rules concern intrastate service or traffic in all instances, whether the car is to move, or has moved, from point to point within the State, or is to move, or has moved, beyond the borders of the State; and the State, therefore, can regulate this traffic, unless it be limited by the exertion of the constitutional power of congress with respect to interstate commerce and its instruments.

(2) If it should be determined that demurrage rules do not in all instances concern intrastate traffic, nevertheless the State in the absence of Federal legislation and regulation, can make such rules and regulate such traffic, so long as its regulation does not directly burden interstate traffic.

1. Has the Michigan Railroad Commission power or authority to make and enforce demurrage rules as to shipments in interstate commerce? It may be said that Federal jurisdiction as to interstate commerce is exclusive. By the Federal Constitution, congress is given express power "to regulate commerce with foreign nations and among the several States." The nature and extent of the power conferred by this provision have been under consideration in a vast number of cases in the United States Supreme Court. A citation of the cases would cover many pages of this opinion. Many of them are referred to in the late case of *Simpson* v. *Shepard*, 230 U. S. 352 (33 Sup. Ct. 729, 48 L. R. A. [N. S] 1151. A reading of the several acts of congress upon the subject shows that that body, in the exercise of the broad and exclusive power conferred by the Constitution, has given the

subject of interstate commerce most careful consideration, and its legislation upon the subject is very complete and thorough.

Has congress acted upon the identical question we are considering?  On June 29, 1906, the interstate commerce commission act was amended in several particulars.  In that part of section 1 which defines the term "transportation," it was made to read as follows:

"The term 'transportation' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigerating or icing, storage, and handling of property transported; and it shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation upon reasonable request therefor, and to establish through routes, and just and reasonable rates applicable thereto."

By the same act (section 6), which provides for the filing and publishing of rates and schedules, that part of the paragraph relating to this question was made to read as follows:

"The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee."

Here we have an express recognition of the fact
183 Mich.—2.

that *terminal* and *storage* charges, and rules and regulations relating thereto, have a direct effect upon rates and charges. That demurrage is a terminal charge is, we think, beyond question. The act provides heavy penalties and liabilities for its violation. The administration of the law is expressly conferred upon the Interstate Commerce Commission.

A comparison of the language of the act of congress with that of the Michigan Act No. 300 shows that the former was intended to control and cover every incident of interstate commerce, including receipt, delivery, elevation, transfer in transit, ventilation, refrigeration, icing, storage, and handling of property transported, all terminal charges, storage charges, and rules relating thereto, just as the Michigan act was intended to cover every incident of intrastate commerce, including "all services in connection with the receipt, delivery, elevation, switching and transfer in transit, ventilating, refrigeration or icing, storage and handling of * * * property transported between points within this State."

We think that shipments for interstate commerce become impressed with the character of such commerce from the first receipt thereof, and this character continues until the final delivery thereof to the consignee. Such is the plain intent of the language of the Federal legislation, and the similarity of the language of the two acts is evidence that the Michigan legislature of 1909 had in mind the Federal legislation above referred to. It cannot be presumed that the legislature intended or attempted to invade the field covered by the Federal legislation, and thus render its own action invalid. The learned circuit judge quoted the following language found in the case of *Chicago, etc., R. Co.* v. *Elevator Co.,* 226 U. S. 426 (33 Sup. Ct. 174, 46 L. R. A. [N. S.] 203) :

"As legislation concerning the delivery of cars for the carriage of interstate traffic was clearly a matter of interstate commerce regulation, even if such subject was embraced within that class of powers concerning which the State had a right to exert its authority in the absence of legislation by congress, it must follow in consequence of the action of congress, to which we have referred, that the power of the State over the subject-matter ceased to exist from the moment that congress exerted its paramount and all embracing authority over the subject."

We think that the above language is applicable to the question we are considering. Has the Interstate Commerce Commission acted? On March 16, 1908, the commission decided that demurrage rules and charges applicable to interstate shipments are governed by the act to regulate commerce, and therefore are within its jurisdiction, and not within the jurisdiction of State authorities. On May 12, 1908, the commission adopted the following rules with relation to demurrage on interstate shipments:

"Demurrage on Interstate Shipments. The act requires that carriers shall publish, post and file 'all terminal charges * * * which in any wise change, affect, or determine * * * the value of the service rendered to the passenger, shipper, or consignee,' and all such charges become a part of the 'rates, fares, and charges,' which the carriers are required to demand, collect and retain. Such terminal charges include demurrage charges."

In the case of *Wilson Produce Co.* v. *Railroad Co.,* 14 I. C. C. Rep. 170, decided June 24, 1908, this exact question was before the Interstate Commerce Commission, and it held that:

"The duty of regulating terminal charges, when related to traffic between the States, has been lodged with the Interstate Commerce Commission. A State statute fixing terminal charges is not controlling with respect to interstate transportation."

This case involved demurrage charges which were held to be terminal charges, within the meaning of the interstate commerce act. Many cases are cited, and it was held that it was unnecessary to decide that the Federal authority over this subject was exclusive, inasmuch as congress had taken definite action, and removed the subject altogether from the field of State regulation. See, also, *Lehigh Valley R. Co.* v. *United States,* 188 Fed. 879 (110 C. C. A. 513) ; *St. Louis, etc., R. Co.* v. *Edwards,* 227 U. S. 265 (33 Sup. Ct. 262).

We have not referred to the action of the Interstate Commerce Commission to show necessarily that its opinion was conclusive, but to show that it has assumed to act under the law of congress. It is said by counsel for defendant that it has not adopted the revised rules of the American Railway Association, but has only tentatively indorsed them, as shown by the bulletin above quoted. To indorse is to sanction, ratify, or approve. The difference between adoption and indorsement is not very important. But it is said that it has only tentatively indorsed the national rules. It is true that the commission has only approved of these rules by way of trial. That is probably all it would do in the adoption of any rules. They would be subject to the right of change or amendment.

We think that the pertinent question is: Has the commission so acted under the law of congress that it can be said that the subject is removed from State regulation? Such question must be answered in the affirmative. We adopt the language of the trial judge:

"When congress placed the instrumentalities and the cars and the terminal charges and the storage charges into the hands of the Interstate Commerce Commission, those who, as to interstate traffic, desired to complain must apply to that tribunal for an adjustment of their grievances. The Michigan law,

in so far as it attempts to give jurisdiction to a different tribunal, has invaded the domain of congress, and its enactment is of no force."

We are forced to the conclusion, therefore, that the amendments of 1911 are without force or effect in so far as interstate commerce is concerned. By the Federal Constitution the subject of interstate commerce is within the exclusive jurisdiction of congress and congress has, by its legislation, taken possession of the entire subject. Therefore it is obvious that "demurrage rules applicable to all traffic beginning *or* ending within this State" can only apply to traffic beginning *and* ending within this State. Upon this branch of the case we agree with the circuit judge.

2. This brings us to the second proposition of complainants. We are of the opinion that any car service on a car which has moved or is about to move in intrastate commerce is intrastate, and therefore within State authority. In so far as the rules promulgated by the defendant apply to cars that are moving from point to point within this State, they are valid. The mere fact that those rules differ from the uniform rules in a few instances does not render them invalid, when applied to intrastate traffic. We have read this record carefully, and are unable to say that the Michigan rules, when applied to Michigan traffic, are unreasonable in themselves, or that they constitute a regulation of, or a burden upon, interstate commerce. It should be borne in mind that by section 26 of the Michigan act of 1909 it is provided that:

"In all actions under this section the burden of proof shall be upon the complainant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be." *Michigan Central R. Co.* v. *Railroad Commission,* 160 Mich. 355 (125 N. W. 549).

We do not think that the complainants have sus-

tained the burden of proof placed upon them by this statute. Much more might be said upon this branch of the case, but, as this opinion is already too long, we refrain from stating our reasons at length, for the conclusion reached.

Our attention has been called to the opinion of the Supreme Court of the United States in the *Shreveport Case*, filed June 8, 1914. We do not think that case controlling here, for the reason that in that case the Interstate Commerce Commission had acted, and had found that the State action was unreasonable. We do not find such action here unreasonable, when applied to State traffic.

The decree of the circuit court will be modified in accordance with the views here expressed, and the injunction will be so modified that the defendant will be permitted to enforce its rules as to intrastate traffic only. No costs are awarded to either party.

MCALVAY, C. J., and OSTRANDER, MOORE, and STEERE, JJ., concurred. BROOKE, KUHN, and BIRD, JJ., did not sit.